IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Crim. No. 07-115-SLR |
| ) | |
| CHARLES A. WEBSTER, JR., ) | |
| ) | |
| Defendant. ) | |

David Weiss, Acting United States Attorney, and Edward J. McAndrew, Assistant United States Attorney, United States Attorney's Office, Wilmington, Delaware. Counsel for Plaintiff.

Robert D. Goldberg, Esquire, Biggs and Battaglia, PC, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: April 14, 2009
Wilmington, Delaware

*[signature]*
ROBINSON, District Judge

## I. BACKGROUND

On August 28, 2007, defendant Charles A. Webster, Jr., was indicted on two counts of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). (D.I. 8) He entered a plea of not guilty and a two-day jury trial commenced on December 8, 2008.[1] (D.I. 51) On December 9, 2008, the jury returned a guilty verdict on count two of the indictment and a not guilty verdict on count one of the indictment.[2] (D.I. 56) Defendant subsequently moved for judgment of acquittal and new trial pursuant to Fed. R. Crim. P. 29 and 33. (D.I. 62)

Defendant contends the jury's guilty verdict on count two was not supported by sufficient evidence and argues that the prosecutor's comment regarding the silence of CWS was so prejudicial, given the closeness of the case and the totality of the evidence, that a judgment of acquittal or new trial is warranted. (D.I. 62, 64) Plaintiff United States of America opposes the motion, arguing that there was sufficient evidence to support the jury's finding of guilt and that the prosecutor's comments at

---

[1] Testifying for the government were Jeanette Lingafelt ("Lingafelt"), Marc Alfree ("Alfree") and Stephen Legenstein ("Legenstein"). (D.I. 66) Testifying on behalf of defendant was Ophelia Thomas ("Thomas"). Another witness, Charles Webster, Sr. ("CWS"), was subpoenaed by the government to testify at trial. CWS had previously testified before the grand jury considering the case against defendant. After learning that CWS' anticipated testimony might differ from the testimony he gave before the grand jury, the court appointed counsel to represent CWS for purposes of the defendant's trial. As part of a proffer to determine the nature of CWS' testimony, the government called CWS to the stand. However, because CWS refused to answer questions and invoked his Fifth Amendment Right not to testify, the court ruled that counsel was barred from introducing CWS' statements and from commenting upon the lack of any statements. (D.I. 66 at 33)

[2] Count one charged defendant with possession of a Taurus, .38 caliber revolver ("Taurus revolver"), and count two charged defendant with possession of a Ruger, .45 revolver ("Ruger revolver"). (D.I. 8)

closing argument do not implicate the Confrontation Clause of the Fifth Amendment. (D.I. 63) The matter is fully briefed. (D.I. 62, 63, 64) The court has jurisdiction pursuant to 18 U.S.C. § 3231. For the reasons that follow, defendant's motion will be denied.

## II. STANDARD OF REVIEW

Federal Rule of Criminal Procedure 29(c)(1) provides that, following a jury verdict, "a defendant may move for a judgment of acquittal." In ruling on a motion for judgment of acquittal, the court must "view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Lacy*, 446 F.3d 448, 451 (3d Cir. 2006). Courts must be "vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). The defendant bears a "very heavy burden" when challenging the sufficiency of the evidence supporting a jury verdict, *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995), and "a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

Federal Rule of Criminal Procedure 33 allows a court, upon motion of a defendant, to grant a new trial if mandated by the interests of justice. *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003). A court may order a new trial where the jury's verdict is contrary to the weight of the evidence only if the court believes that

there is a serious danger of a miscarriage of justice, that is, an innocent person has been convicted. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). In reviewing a Rule 33 motion, the court exercises its own judgment in assessing the case against the defendant and the decision to grant a new trial is vested within the court's sound discretion. *Johnson*, 302 F.3d at 150; *United States v. Mastro*, 570 F. Supp. 1388, 1390 (E.D. Pa 1983).

## III. DISCUSSION

### A. Sufficiency of Evidence

Plaintiff called Lingafelt[3] as its first witness. (D.I. 66 at 64) Lingafelt testified that in the early evening hours of August 23, 2007, she (along with probation officers Latsko[4] and Willoughby, New Castle County Detective Marc Alfree, and several other New Castle County police officers) arrived at 8 Cheswold Boulevard, Apartment 2A to conduct an unannounced administrative search of defendant's apartment.[5] Defendant lived in the apartment with CWS and, occasionally, his sister and niece would stay there. (*Id.* at 64, 82, 97-101; GX1)

---

[3]Lingafelt is a Delaware Senior Probation Officer assigned to the Safe Streets Task Force. (*Id.* at 62) She testified that the Safe Streets Task Force is comprised of probation and parole officers along with county police officers tasked with investigating active probationers to determine whether they are abiding by the conditions of their probation. (*Id.*)

[4]Latsko was defendant's probation officer. (*Id.* at 64)

[5]At the time of the search, defendant was on supervised probation for a prior conviction. (GX1) One of the conditions of defendant's supervised probation was that he was subject to unannounced searches at any time by probation. (*Id.*)

After a few minutes, defendant answered the officers' knock on the apartment door. (*Id.* at 65) Latsko immediately recognized and handcuffed defendant, while Willoughby patted him down for weapons and officer safety. (*Id.*) Defendant was seated on a dining room chair, as officers confirmed that he was alone in the apartment.

Lingafelt and Willoughby then started to search the apartment, beginning with defendant's bedroom. (*Id.*) In this bedroom, located in the rear of the apartment, officers discovered defendant's clothing and sneakers, as well as mail addressed to him at the apartment address. (*Id.* at 66, 102) Hidden inside a red and white sneaker, Lingafelt found about $1,400 in cash. (*Id.* at 67) In the other bedroom, officers discovered clothing and personal items belonging to CWS and, tucked in between the mattress and box spring, officers discovered a machete. (*Id.* at 68)

Proceeding next to an unlocked hall closet, Lingafelt found one rubber fishing boot,[6] along with coats, toolboxes and a lunch box. (*Id.* at 103-104) Hidden inside the boot was a loaded Ruger revolver. (*Id.* at 104; GX1, GX2) The butt of the Ruger revolver was sticking up and the barrel was sticking down inside the boot. (*Id.* at 120) Lingafelt testified that the revolver contained five live rounds and one spent casing, indicating that the weapon had been fired once. (*Id.* at 73; GX2)

Contemporaneously, CWS, defendant's sister and his niece entered the apartment; the relatives stayed in the living room with officers as the search continued. (*Id.* at 104-113) CWS was seated on the couch and the two females were seated on

---

[6]The matching mate to the fishing boot was not inside the closet. (*Id.* at 122)

4

the love seat. (*Id.* at 66, 77) When officers started to search the living room, defendant's relatives were asked to stand up so that the furniture could be searched. (*Id.* at 78, 92) When Lingafelt lifted one of the couch cushions, she discovered a loaded Taurus revolver stuffed in between the arm of the couch and the cushion. (*Id.* at 76, 113- 114; GX3) Lingafelt testified that, although loaded, the Taurus revolver had not been fired. (*Id.* at 82) After the search was finished, defendant was taken into custody.

The jury was shown portions of video recordings of a police interview conducted by Alfree and defendant soon after the arrest.[7] (*Id.* at 93, 98; GX7) Alfree testified that defendant agreed to be interviewed and signed a form waiving his Miranda rights. (*Id.* at 93) In the video, defendant stated that he lived at the apartment with his father and that his sister and niece stayed there occasionally. (*Id.* at 99) Defendant acknowledged that three bad things had happened to him recently. (*Id.* at 100)

First, about a week before the search, his apartment had been broken into and thieves took jewelry, clothing, a laptop, an X-Box game system and other items. (*Id.* at 102) Although the thieves accidentally left their cell phone, defendant was unable to conclusively identify the thieves to Alfree. (*Id.* at 103-104, 106)

---

[7]The jury was instructed, before the interview was broadcast and, again, during the final charge, that the transcripts of the interview were not evidence but were provided only as a guide for the jury to follow what was being said. (*Id.* at 98-99; D.I. 53 at 14)

Second, just days after the apartment robbery, defendant told Alfree that he had been shot in the buttocks while standing outside of his apartment building.[8] (*Id.* at 100-101) Defendant denied knowing the reason for the shooting, but acknowledged that "two dudes I know, man, they really trying to kill me." (*Id.* at 101) Defendant believed the shooting was related to the robbery. (*Id.* at 105)

Third, the day before the apartment search, defendant was standing in the street when he saw his cousin drive by. (*Id.* at 107) Defendant flagged the car down and talked for a few minutes with his cousin, the passenger, and her boyfriend, the driver. Within minutes of the car pulling away, defendant received a cell phone call informing him that his cousin had been shot in the face. Defendant told Alfree that people told him the shooting was related to defendant. (*Id.* at 108)

During the video, when asked about guns, defendant told Alfree that he did not have any guns. (*Id.* at 108) He stated, however, that his dad had a gun and that it was kept in the apartment. (*Id.* at 108-109) Defendant described his father's gun as "old revolver type, big ugly, old thing" that was "brown, beige, or black, one of them." (*Id.* at 109) Defendant did not think there were other guns in the apartment, especially since he was on probation and prohibited from having any weapons. (*Id.* at 109-110)

Alfree also testified that his investigation into the ownership of the revolvers revealed that they had been stolen from somewhere else. (*Id.* at 122) Further, neither revolver was registered to CWS or any member of defendant's family. (*Id.* at 123)

---

[8]Detective Legenstein testified, briefly, regarding his investigation of the shooting and his discussion with defendant at the hospital. (*Id.* at 124)

Defendant called Ophelia Thomas as his only witness. (*Id.* at 132) She testified that she was in a relationship with defendant at the time of the apartment search. (*Id.* at 133) She never saw defendant with a gun. (*Id.* at 134) She knew that defendant had been shot and that his apartment had been robbed. (*Id.* at 133-134) Because of these events, she scrapped scarce resources to buy a weapon to protect her family. (*Id.* at 134-136, 139; DX1, DX1A) She bought the gun the same day as the apartment search. (*Id.* at 137) She did not understand the reason defendant would have two guns when she had just spent all her money to buy one gun. (*Id.* at 140)

Considering this evidence in light of the standards under Fed. R. Crim. P. 29 and 33, the court concludes there was substantial evidence to uphold the jury's guilty verdict and, similarly, nothing presented to suggest that the interests of justice mandate a new trial. Specifically, in order to find defendant guilty of possessing a firearm subsequent to a felony conviction, the government had to prove the following three elements beyond a reasonable doubt:

> First, that defendant has been convicted of a felony, that is a crime punishable by imprisonment for a term exceeding one year;
> Second, that after this conviction, defendant knowingly possessed the firearm described in . . . count[ ] two of the indictment; and
> Third, that defendant's possession was in or affecting interstate or foreign commerce.

(D.I. 53 at 18) Because the parties stipulated as to the first and third elements, the trial focused on the second element, i.e., whether defendant knowingly possessed the

Ruger revolver.[9] The government sought to prove this under a constructive possession theory.[10] (D.I. 63 at 3)

A person has constructive possession over a thing if he "knowingly has both the power and the intention at a given time to exercise dominion or control over [the] thing, either directly or through another person or person." *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992), quoting *United States v. Blackson*, 940 F.2d 877, 883 (3d Cir. 1991). Constructive possession requires both "dominion and control over an object and knowledge of that object's existence." *Iafelice*, 978 F.2d at 96.

---

[9]The parties stipulated that on August 23, 2007, defendant was convicted in Superior Court for New Castle County of possession of a firearm during the commission of a felony. (GX1)

[10]The jury charge defined knowing possession as:
To establish the second element of the offense, the government must prove that defendant "knowingly" possessed the firearms in question. This means that the government must prove, beyond a reasonable doubt, that defendant possessed the firearms in question purposely and voluntarily, and not by accident or mistake, and that he knew that the objects were firearms.
To "possess" means to have something within a person's control. The government does not have to prove that defendant physically held the firearms, that is, had actual possession of them. As long as a firearm was within defendant's control, he possessed it. If you find that defendant either had actual possession of a firearm or had the power and intention to exercise control over it, even though it was not in his physical possession - that is, that defendant had the ability to take actual possession of the object when he wanted to do so - you may find that the government has proven possession. Possession may be momentary or fleeting.
Mere proximity to a firearm or mere presence on the property where it is located or mere association with the person who does control the firearm or the property, is insufficient to support a finding of possession.
The government need not prove that defendant owned the firearms. The government also need not prove that defendant knew that he was breaking the law by possessing the firearms, or that he possessed the firearms with the intent to cause harm.
(D.I. 53 at 22)

8

To demonstrate constructive possession, the government must prove beyond a reasonable doubt that: (1) defendant had knowledge of the firearm's existence; (2) defendant had the power to exercise dominion and control over the firearm; and (3) defendant had the intent to exercise dominion and control over the firearm. *United States v. Bellinger*, 461 F. Supp.2d 339, 346 (E.D. Pa. 2006). Constructive possession may be proven by either direct or circumstantial evidence. *United States v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006).

The court concludes that there was sufficient evidence presented at trial for a reasonable jury to find that defendant knew of the Ruger revolver and that he had the power and intent to exercise dominion and control over that firearm. First, the evidence presented and presumably considered by the jury included: (1) defendant lived in the apartment, had full and unfettered access to the apartment as well as to all things therein; (2) defendant lived in the apartment at the time it was robbed and was familiar with the various items stolen during the robbery; (3) the Ruger revolver was found in an unlocked hallway located in a common area, accessible to defendant as well as others; (4) the Ruger revolver was stolen and not registered to any occupant of the apartment; and (5) during the interview, defendant admitted knowing that CWS had a revolver in the apartment.

The court further finds that several reasonable inferences and conclusions could be drawn to support the jury's verdict. Significantly, by comparing defendant's description of the revolver with the actual Ruger 45, the jury could have reasonably concluded that was the same weapon, and that defendant had access as well as the ability to take actual possession of it. Moreover, the testimony regarding the robbery

and shootings could have led the jury to infer that defendant needed a gun for personal protection. In fact, Thomas' testimony supports that deduction. She testified that, because of the robbery and shootings, she needed a gun for protection and purchased one the same day of the apartment search.

## B. Prosecutor's Comments

Defendant argues that the prosecutor's comment upon the silence of a witness - CWS (whom defendant could not call because CWS intended to invoke the Fifth Amendment) - was so prejudicial, given the closeness of the case, that a judgment of acquittal or new trial is the only remedy that can repair the damage. (D.I. 64 at 1)

As noted previously, *infra* fn. 1, the court barred counsel from presenting testimonial statements by CWS because CWS had invoked his Fifth Amendment Right to not testify and, therefore, was unavailable for cross examination at trial.[11] *Crawford*

---

[11] The following occurred during the proffer:
PROSECUTOR: [CWS], if you are called to the stand during this trial by either the government or the defense, do you intend to assert your Fifth Amendment right to any questions about the guns?
CWS: Yes. Yes, I do.
PROSECUTOR: And that would include your knowledge of the guns?
CWS: Yes.
PROSECUTOR: All right. And it would also include your prior testimony before the Grand Jury about that:
CWS: Yes.
PROSECUTOR: All right.
    Very well, your Honor. I think that covers it for the government.
THE COURT: All right. I just want to make sure, [CWS], that you understand, and that counsel for the defendant understand, that having taken the Fifth Amendment, you can't be called upon to answer any questions. As far as I'm concerned, you cannot be called to the stand at all at this point in time. Do you understand that?
CWS: Yes.
(D.I. 66 at 35-37)

*v. Washington*, 541 U.S. 36 (2004). The comment challenged by defendant was made on the second day of trial, during the government's closing remarks. (D.I. 67) The prosecutor's closing statement constituted 23 pages of the trial transcript.[12] (*Id.* at 1-23) Approximately half way through those remarks, the prosecutor made the statements at issue:

> Now, [Probation Officer Lingafelt] told you that during the search, three of defendant's family members arrived at the apartment, including [CWS] and [defendant's sister]. Detective Alfree also talked about this when he testified. He was our second witness. And he talked about a portion of the search that he observed. He told you that [CWS] and another female member came back to the scene, came to the scene, left, came back. All right.
> So you didn't hear that either of them when they first came back, said, hey, there are guns in there that are mine. You didn't hear that evidence. There's no evidence on that point.
> So Probation Officer Lingafelt and Detective Alfree both explained that the family members were allowed eventually to come into the apartment and sit down. You know, it's [CWS'] place. They let them sit on the couch in a love seat while the search is going on. And Detective Alfree told you that they were always in the room with them. They weren't left there, out of sight, out of mind. They are conducting a search they've already found one weapon by the time they come back in.
> So they told you how the family members were eventually asked to stand up, because they weren't sure if the couch had been searched, and now they have family members sitting on a couch. They've already found a gun and they are concerned about the potential of other weapons in the

---

[12]Following the prosecutor's closing remarks, a sidebar was held wherein defendant raised his objections to the comments at issue. Although the court ruled against defendant's objection to these remarks, the court found inappropriate the prosecutor's subsequent remarks, where he inserted his personal opinion into the case, using "I think". According to the court,
> I find that inappropriate, and especially when you are talking about the kind of speculation that I specifically did not allow in during the course of the other interview. So it's doubly troubling for me. For that reason, I'm not going to allow you to do any rebuttal. So, we'll end with [defendant's counsel's] closing and we'll go to the jury instructions. (*Id.* at 25)

> house.
>     Nowhere in the course of the couch search, when they tell the parents, the family to stand up, when the family is standing there, when they are flipping the cushions, did you hear evidence that somebody said, hey, wait a minute. You're going to find a gun. I've got a gun. It's in there. I just want you to know. You didn't hear that. There's no evidence on that.
>     Probation Officer Lingafelt told you about how the officers found that second gun, the loaded .38 Special under the cushion of the couch. That's the silver one, the smaller one. All right? She told you how it happened with the family standing right there. Detective Alfree was in the room, too. He told you about it.

(*Id.* at 12-13) Defendant submits that the statements suggest that, had the revolver belonged to CWS, he would have told the police at the time of the search and, because he did not so advise the police, the revolver must have belonged to defendant. (D.I. 64) Defendant was unable to rebut the prosecutor's statements because, pursuant to the court's ruling, he was prohibited from calling CWS or from commenting upon anything he may have said during the search.

The government counters that the prosecutor's closing argument is not evidence and the court clearly instructed the jury on this point. The court agrees. An attorney's remark during closing argument is not testimonial evidence covered by the Confrontation Clause. *United States v. Taylor*, 509 F.3d 839, 850 (7th Cir. 2007). "As every jury is instructed, lawyers' statements are not evidence." *Id.* The jury at bar was instructed to base its decision solely on the evidence seen or heard in the courtroom and was specifically advised that "[t]he lawyers' statements and arguments are not evidence. Their questions and objections are not evidence." (D.I. 53 at 6-7)

Furthermore, the comments at issue were brief and made in the middle of the prosecutor's closing. Although the prosecutor's closing could have been more carefully worded, the record does not support a finding that this comment was so egregious as to

affect the outcome of the proceedings. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(a prosecutor's misconduct will cause a conviction to be set aside, where it has so infected the trial with unfairness as to make the resulting conviction a denial of due process.)

## IV. CONCLUSION

The testimony elicited by the government at trial, which the jury apparently believed, together with the exhibits and stipulations of the parties, was sufficient to establish the elements of the offense beyond a reasonable doubt. Defendant's motion for judgment of acquittal or new trial is denied. An appropriate order shall issue.